Filed 11/27/23  Aguilar v. Dignity Health CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DANNY RUIZ AGUILAR, Plaintiff and Appellant, v. DIGNITY HEALTH et al., Defendants and Respondents. | B313734 (Los Angeles County Super. Ct. No. BC712630) |

APPEAL from judgments of the Superior Court of Los Angeles County, Rafael A. Ongkeko, Judge.  Affirmed.

Kenneth M. Sigelman & Associates and Kenneth M. Sigelman for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, and Matthew S. Levinson for Defendants and Respondents Scott A. Beasley and David N. Steinberg.

La Follette, Johnson, DeHaas, Fesler & Ames, Christopher P. Wend, and David J. Ozeran for Defendants and Respondents Michelle D. Henry and Keith A. Kolber.

_____

Appellant Danny Ruiz Aguilar alleges that, either during his delivery by caesarean section in April 2010 or shortly thereafter while in the neonatal intensive care unit (NICU) of the California Hospital Medical Center (CHMC), his skull was fractured, leading to a traumatic brain injury and neurological impairment, such as impaired cognitive and motor skills. In 2018, through his guardian ad litem, he sued several defendants, including the four respondents in this appeal: David N. Steinberg, Scott A. Beasley, Michelle D. Henry, and Keith A. Kolber. Steinberg is an obstetrician who assisted non-party Thomas Cachur in Aguilar's delivery; Beasley, Henry, and Kolber are neonatologists who cared for Aguilar after birth until he was transferred to Children's Hospital Los Angeles (CHLA) six days later. In the operative complaint, Aguilar alleged causes of action for medical negligence, fraud, and willful misconduct, contending the defendants caused and/or knew of his skull fracture but deliberately concealed and failed to treat it.

Each respondent moved for summary judgment, which the trial court granted. On appeal, Aguilar alleges the court erred because: (a) it failed to apply the doctrine of res ipsa loquitur; (b) Aguilar established a triable issue of material fact on each cause of action; and (c) a different judge denied the motion for summary judgment brought by Cachur.

We conclude that Aguilar: (a) failed to establish the prerequisites for res ipsa loquitur; (b) did not establish a triable issue of material fact as to his causes of action; and (c) forfeited the argument regarding the ruling on Cachur's motion by failing to supply an adequate record. We therefore affirm.

2

# FACTUAL AND PROCEDURAL BACKGROUND[1]

## A.  *Aguilar's Complaint*

Aguilar filed a complaint in July 2018, and a first amended complaint (the operative complaint) in October 2018.  The first amended complaint alleged that, on April 9, 2010, "during the delivery and/or in the immediate neonatal/post-delivery period," Aguilar "suffered a traumatic head injury as a direct result of negligent[] and/or reckless conduct by" all or some of the defendants, including the respondents.  Aguilar further alleged that the respondents (and others) knew of his injury but deliberately concealed it from Aguilar and his mother.  Aguilar also alleged that on April 14, 2010, a CT scan of his head showed "multiple abnormalities, including, but not limited to, abnormalities demonstrating traumatic injury to the head and brain," including "skull fracture, acute subdural hematoma in multiple locations, parenchy[m]al hemorrhage within multiple areas of the brain, and extra-axial soft tissue swelling."  The report dictated by the radiologist reviewing this scan asked whether there was a " 'history of traumatic delivery?' "  Aguilar contended that the failure to treat his brain injury caused "a substantial volume of brain tissue" to die.  Based on these facts, Aguilar alleged causes of action for medical negligence, fraud, and willful misconduct against all the defendants, including the respondents and non-party Cachur.

---

[1] We limit our summary to the facts and procedural history relevant to the issues raised on appeal.

## B. *Motions for Summary Judgment*

### 1. Evidence

Respondents and Aguilar each submitted expert witness declarations in support of or in opposition to the motions for summary judgment. While, as discussed below, the opinions of these experts differed, the timeline of events that each expert constructed after reviewing the medical records did not conflict. For ease of discussion and to avoid repetition, we set forth the relevant portions of the agreed-upon timeline:

On March 30, 2010, Aguilar's mother presented at Clinica De Los Angeles Medical Group "with pregnancy complications of gestational diabetes mellitus and borderline hypertension." One week later, she returned "with increased blood pressure, headache, and blurred vision."

On April 9, 2010, Cachur delivered Aguilar via C-section at 34 weeks gestation; Steinberg assisted in the delivery. The report for the birth made no reference to any significant complication or trauma. Aguilar was born "dusky, with no tone, no respiratory effort, and low heart rate." After being stimulated and given positive pressure ventilation, Henry intubated him and transferred him to the NICU, where it was discovered that he suffered from thrombocytopenia; his hematocrit was 62.8 percent.[2] Henry examined Aguilar after admission and her notes indicated his head was " 'normocephalic and atraumatic' " with a "soft anterior fontanelle." Aguilar remained in Henry's care until

---

[2] According to Aguilar's appellate brief, thrombocytopenia is a condition of having low blood platelets and hematocrit measures the volume of a person's red blood cells (i.e., the proportion of red blood cells in the blood).

7:00 a.m. on April 10, at which time he was transferred to Kolber's care. Aguilar remained on assisted ventilation until April 10. Throughout his stay at CHMC, Aguilar's muscle tone remained low, and he had difficulty tolerating oral secretions.

On April 10, 2010, Kolber prepared a NICU Progress Record, noting Aguilar's head was "normocephalic and atraumatic with soft anterior fontanel." He was extubated to nasal positive pressure. His hematocrit was 46.7 percent.

On April 11, 2010, Aguilar's "anterior fontanelle remained flat and soft, and [his] head without evidence of trauma." His hematocrit was 46.4 percent. He suffered "bradycardia-desaturation events" in the morning and "a cardiorespiratory arrest requiring reintubation and chest compressions" in the evening. Kolber did not note any head trauma or abnormal head findings.

On April 12, 2010, Beasley's Progress Record noted Aguilar's "head as normocephalic and atraumatic and the anterior fontanelle as soft." Due to the "persistent abnormal neurologic exam," Beasley "ordered a head ultrasound to evaluate for infarction or intracranial hemorrhage"; the ultrasound was "interpreted as unremarkable." Kolber again did not note any head trauma or abnormal head findings.

On both April 13 and 14, 2010, Beasley's Progress Record noted Aguilar's "anterior fontanelle remained soft and his head normocephalic and atraumatic." However, Beasley noted that Aguilar had "decreased tone, decreased movement, decreased deep tendon reflexes, and decreased gag reflex," leading him to order a CT scan of Aguilar's brain, wanting " 'Eval for infarction or malformation.' "

On April 14, 2010, Aguilar's hematocrit was 35.6 percent. The radiologist reviewing the CT scan (Alix Vincent) "noted an acute subdural hematoma posterior to the cerebellar hemispheres and in the peritentorial regions with a small subarachnoid component present in the supravermian cistern. He also noted an acute subdural hematoma present in the occipital regions and interhemispheric fissure. Dr. Vincent's report also noted low attenuation changes in the white matter of the cerebral hemispheres with extensive encephalomalacia involving the right cerebral hemisphere with associated parenchymal hemorrhagic change." Finally, Vincent reported a "strong suspicion for fracture involving the posterior edge of the right parietal bone at the level of the posterior aspect of the right lambdoid suture" and asked, "[i]s there a history of traumatic delivery?" Vincent spoke with Kolber, advising that "there was a subdural hematoma compressing the right cerebellum with a 'probable right occipital fracture.' " Vincent's report was the first mention of trauma or injury to Aguilar's head, apart from the listing of " 'evaluat[ing] for . . . intracranial hemorrhage' " as a reason for the cranial ultrasound.

On April 15, 2010, Aguilar was transferred to CHLA. The physician who examined Aguilar's head upon admission noted there was a " 'palpable fracture at Rt occipital area.' " He was discharged on July 20, 2010.

In 2017, Aguilar was readmitted to CHLA. An Invitae Myopathy panel was performed; it revealed that Aguilar was born with "micro-tubular myopathy."

## 2. Respondents' Motions

In March 2020, Beasley moved for summary judgment. Supported by the declaration of neonatologist Denise M. Suttner,

Beasley argued that he acted within the standard of care, that "there is no clinical evidence to suggest that Danny Ruiz-Aguilar [*sic*] sustained any traumatic injury to his head prior to April 12, 2010 when the ultrasound was ordered by Dr. Beasley," that CHLA "found no evidence of a skull fracture or any other traumatic cause of the neurologic deficits exhibited by" Aguilar, that "the myotubular myopathy with which the plaintiff was diagnosed was the likely cause of the neurologic abnormalities" he exhibited, and that nothing Beasley did or did not do resulted in any injury to Aguilar. As to the fraud and willful misconduct causes of action, Beasley argued that he had established he was unaware of any traumatic injury to Aguilar's head, and that had there been such an injury, Beasley would have "intervened and ensured that timely and appropriate care was rendered thereto."

In April 2020, Henry and Kolber moved for summary judgment on Aguilar's cause of action for medical negligence.[3] Supported by the declaration of neonatologist Krisa Van Meurs, they argued that they acted within the standard of care and that no action or inaction on their part caused Aguilar's injury, which "was not caused by a head injury during or after birth, but was most likely a genetic condition, as demonstrated by the plaintiff's subsequent medical care at Children's Hospital of Los Angeles." They added that "[t]here were no signs or symptoms displayed by Danny [Aguilar] during the time they treated him prior to April 14, 2020 by which they were required under the standard of care to order a CT scan or undertake other testing to investigate a

_____

[3] In October 2019, the court granted Henry and Kolber's unopposed motion for summary adjudication as to fraud and willful misconduct. Aguilar has not contended the court erred in doing so.

7

possible brain injury" and "[t]here was no clinical evidence to suggest that Danny sustained any traumatic head injury during the time he was under the care of Dr. Henry or Dr. Kolber."

In June 2020, Steinberg moved for summary judgment. Supported by a declaration from obstetrician and gynecologist James A. Macer, Steinberg argued that he assisted Cachur in the C-section delivery of Aguilar and that his role "would have been limited to ensuring that the primary surgeon's view remained unobstructed, holding sutures and keeping blood out of the way for the primary surgeon, and generally helping to facilitate the flow of the surgery itself." Steinberg claimed he "would not have had any contact during or after the delivery with minor plaintiff," "did not provide any further care to the infant after he was passed to the neonatal team," and "did not make any chart entries relative to [his] role as assistant surgeon on April 9, 2010." Steinberg stated "he did not injure the infant's head, did not crush the infant's head, and did not drop the infant." He also professed to have no knowledge or recollection of anyone else injuring Aguilar's head. He therefore argued he met the standard of care and was entitled to summary adjudication on the medical negligence cause of action. Steinberg additionally argued he was entitled to summary adjudication on the fraud cause of action because Aguilar could not show that Steinberg deceived or concealed anything from Aguilar. Finally, he argued he was entitled to summary adjudication on the willful misconduct cause of action because Aguilar could not show that Steinberg had knowledge that any injury to Aguilar was probable, or that Steinberg had consciously refrained from taking action to prevent Aguilar's injury.

8

### 3.     Aguilar Opposes the Motions

In February 2021, Aguilar submitted substantively identical oppositions to all three motions.[4]

### (a)     Expert Declarations

Aguilar submitted the same three expert declarations in opposition to each motion for summary judgment.  Specifically, he submitted declarations from neonatologist Maureen Sims, child neurologist William Weiss, and neuroradiologist Barry Pressman.  All claimed to have reviewed Aguilar's medical records, and arrived at the following opinions.

First, Pressman asserted the April 12 cranial ultrasound was not normal; it revealed "bilateral posterior subdural hemorrhage extending into the interhemispheric fissure and onto the right side of the tentorium and subdural hemorrhage in the posterior fossa," which was "consistent with hemorrhaging from impact (as opposed to a stroke-type bleed or other etiology) and, therefore, evidence of trauma to the baby's head."

Second, Sims opined that the April 14 CT scan "reveals a significant skull fracture" and "extensive intracranial and parenchymal bleeding," which indicates "serious trauma to the baby's head that fractured the skull."  Weiss concurred, and added that the neuroradiologist's findings from this scan were "consistent with Dr. Pressman's subsequent review of the ultrasound images."

Third, Sims stated that the symptoms experienced by Aguilar from birth—"need for a resuscitation involving chest compressions and intubation, the initial hypotension and poor

---

[4] Aguilar's opposition to Henry and Kolber's motion did not discuss the fraud and willful misconduct causes of action.

9

pulses," "drop in his hematocrits," "low platelet count," "profoundly low sodium values with the probable diagnosis of SIADH," second "cardiac arrest," "poor respiratory effort, low muscle tone," and "inability to tolerate oral secretions"—all "point to an intracranial process and were eventually identified on the CT scan (skull fracture and associated intracranial bleeding, parenchymal bleeding and subdural hematoma)." Weiss agreed that Aguilar's "signs of neurological injury were caused by the skull fracture, intracranial bleeding, parenchymal bleeding, subdural hematoma, and associated brain injury."

Fourth, Sims believed the "intracranial hemorrhages and skull fracture was caused either at birth (i.e. during the extraction of the baby via C-section) or in the immediate, post-delivery period (i.e. from head banged or dropped in the delivery room or NICU)" and "[t]he injuries to the baby's skull and brain, as evidenced by the April 14, 2010 CT images, were so significant that they could only have been caused by a blunt force-type trauma (like being dropped on his head or head being banged of hard object) or from a crush-type trauma (i.e. from traumatic extraction efforts during delivery)." Weiss concurred.

Fifth, Sims asserted that Aguilar's injuries were so significant that "it would have been impossible for the medical providers involved in baby boy Aguilar's delivery (Dr. Cachur, Dr. Steinberg and CHMC labor/delivery nurses) and/or immediate post-delivery care (Scott A. Beasley, M.D., Michele Henry, M.D. and Keith Kolber, M.D.) to not have witnessed and/or known about the baby's skull injury." Weiss did not opine it would have been impossible for the doctors not to notice the injury, but stated it was "surprising" they did not do so. He also opined that any doctor who dropped Aguilar or caused or saw a "crush injury"

10

during the C-section would have known or suspected the ensuing trauma.

Sixth, Sims averred that both the CHLA admitting physician's description of the fracture as " 'palpable' " on April 15, 2020, and "the nature of the fracture and bleed findings on the April 14, 2020 CT" scan indicated the skull fracture was visible and palpable "for several days." It was therefore not credible that "Dr. Henry, Dr. Kolber, Dr. Beasley and/or Dr. Steinberg would have missed" the skull fracture in their examinations, "and more likely than not that these medical providers either negligently missed the findings or intentionally failed to document and treat the skull fracture." Both negligently missing the skull fracture and noting it but failing to record or treat it would fall below the standard of care.

Seventh, Sims claimed the failure to record and treat the skull fracture was "a substantial factor in causing or contributing to baby boy Aguilar's harm by causing the skull fracture and intracranial hemorrhage and/or failing to recognize the fracture and intracranial hemorrhage and initiate immediate supportive care and assessment," because "time is of the essence in taking care of a brain injury caused by trauma and quite literally any type of earlier intervention in baby boy Aguilar's traumatic brain injury treatment would have resulted in a better outcome and reduction of neurological residuals." Sims suggested that "evaluation for hypothermia, close vigilance to blood pressure values, and supportive care for head trauma" all "would have resulted in an improvement in baby boy Aguilar's condition." She further opined that no subsequently diagnosed genetic condition would have "caused a skull fracture and intracranial hemorrhage and/or resulted in the neurological abnormalities that baby boy

11

Aguilar suffered from in the neonatal period which resulted directly from that skull fracture."

### (b) Opposition

Instead of directly addressing the respondents' claims that they did not cause, know of, or conceal Aguilar's injuries, Aguilar argued that the three expert witness declarations he submitted "establish that the moving defendants in this case fell below the standard of care by causing or failing to recognize/treat DANNY [Aguilar]'s skull fracture and intracranial hemorrhage - which, according to the nature and extent of the skull fracture and intracranial hemorrhage, would have been recognized either at the time of the trauma that cause[d ]it or to any of the moving defendants who examined DANNY." These declarations also "establish that the negligence of the moving defendants in this case was a substantial factor in causing the skull fracture/intra cranial [*sic*] hemorrhage and/or the worsening of DANNY's condition by failing to recognize/treat the skull fracture/intracranial hemorrhage in a timely fashion." Aguilar further claimed it was not "credible" that no defendant noticed a fracture that the admitting physician at CHLA deemed " 'palpable.' " Aguilar concluded that no subsequently diagnosed genetic condition—such as myotubular myopathy—would have "caused a skull fracture and intracranial hemorrhage and/or resulted in the neurological abnormalities that baby boy Aguilar suffered from in the neonatal period [*sic*] which resulted directly from that skull fracture (poor tone, decreased respiratory efforts, etc.). The trauma is what caused the skull fracture and intracranial hemorrhage, not any genetic condition."

As to the fraud and willful misconduct causes of action, Aguilar argued that the expert witness declarations established

12

that "Aguilar's skull fracture occurred either at birth (i.e. during the extraction of the baby via C-section) or in the immediate, post-delivery period (i.e. from trauma in the delivery room or NICU)," that the fracture was "more likely than not, caused by a crush-type trauma (i.e. from traumatic extraction during delivery), or from blunt force-type trauma (being dropped on his head)," and that "the medical provider(s) actually observing or suspecting crush-type trauma or blunt force-type trauma would likely have known or suspected this trauma had occurred." However, none of Aguilar's doctors "recorded trauma or a suspicion of trauma, or reported it to the family" even though it was "unbelievable that the trauma which caused the injury was not suspected by these medical providers." The opposition did not mention the doctrine of res ipsa loquitur.

### (c)    Separate Statement

In response to each fact in Steinberg's separate statement, Aguilar either admitted the fact or denied it with the following statement: "Dr. Henry and Dr. Kolber [*sic*] fell below the standard of care by causing and/or negligently/intentionally failing to recognize, record or treat baby boy Aguilar's skull fracture. To a reasonable degree of medical probability, Dr. Henry and Dr. Kolber's conduct was a substantial factor in causing or contributing to baby boy Aguilar's harm. The skull fracture occurred either at birth (during delivery) or several days before the April 14, 2010 CT. To a reasonable degree of medical probability, the fracture was so significant that it would have been obvious to any physician performing an examination of the head. The admitting physician at CHLA noted a 'palpable'

13

fracture."[5]  As support, Aguilar cited "Declaration of Maureen Sims, M.D., paras. 4 (a-f) (Exhibit 1); Declaration of William Weiss, M.D., paras. 4 (a-f) & 5 (a-e) (Exhibit 2); Declaration of Barry Pressman, M.D. (Exhibit 3); Excerpts of Records from CA Hospital Medical Center (Exhibit 4) and Excerpts of records from Children's Hospital Los Angeles (Exhibit 5)."

In responding to Beasley's separate statement, Aguilar largely repeated all or a portion of the same denial he used in responding to each fact in Steinberg's separate statement, changing only the names of the physicians.[6]  Aguilar did the same for his response to Henry and Kolber's separate statement.[7]

_____

[5] In response to Dr. Steinberg's "fact" that he never received correspondence regarding a "notice of intent to commence professional negligence," Aguilar denied the fact and asserted "Dr. Steinberg was sent and received a notice of intent."

[6] In response to Beasley's "fact" that the change in Aguilar's hematocrit was "reflective of normal physiologic changes in a newborn, multiple blood draws and intracranial hemorrhaging not consistent with a skull fracture," Aguilar added to his denial: "The neurological abnormalities are consistent with a skull fracture."

[7] In response to Henry and Kolber's separate statement, Aguilar at times stated the skull fracture occurred "from trauma at birth" instead of just "at birth."  Also, in denying Henry and Kolber's "fact" that Aguilar's injuries were caused by tubular myopathy (which they did not cause), Aguilar added: "Regardless of any subsequent diagnosis of a genetic condition, such as myotubular myopathy, this would not have caused a skull fracture and/or resulted in the neurological abnormalities that baby boy Aguilar suffered from in the neonatal period which resulted directly from that skull fracture (poor tone, decreased respiratory efforts, etc.).  The trauma is what caused the skull
*(Fn. is continued on the next page.)*

14

### 4.   Reply Briefs

In March 2021, all respondents filed a reply brief. Respondents also objected to several portions of Aguilar's expert witness declarations as speculative and conclusory.

### (a)   Henry and Kolber

Henry argued that she had only been responsible for Aguilar's care from April 9 to April 10, and Aguilar's experts had not opined that the symptoms he experienced during that time should have alerted Henry to head trauma.  Additionally, the experts had not opined that Aguilar's head trauma would have been apparent before Henry's responsibility for Aguilar's care ended.  Henry also contended Aguilar's experts failed to explain how Aguilar's condition would have improved if detected before April 14.  While acknowledging one expert had given examples of potential courses of treatment, Henry argued that the expert failed to "explain[] how, to a reasonable medical probability, [those courses of treatment] would have resulted in a different outcome."  Moreover, Henry pointed out that Aguilar underwent an intracranial ultrasound on April 12, and the radiologist who reviewed the resulting images concluded there was no evidence of intracranial bleeding.  Although one of Aguilar's experts disagreed with that finding, Henry argued any mistake in reading the ultrasound was not attributable to her.

Kolber echoed Henry's arguments, arguing that he only treated Aguilar between April 10 and April 12, and Aguilar's experts based their argument on the totality of Aguilar's symptoms from birth until transfer to CHLA.  Similarly, Kolber

---

fracture, not any genetic condition."  No additional evidence was cited to support these denials.

argued Aguilar had failed to establish that Kolber's alleged inaction harmed Aguilar in any way.

## **(b)  Beasley**

Beasley argued that Aguilar's experts improperly lumped four physicians together in opining that " 'Dr. Henry, Dr. Kolber, Dr. Beasley and/or Dr. Steinberg' were negligent and that their conduct was 'at a minimum, below the standard of care of medical providers taking care of a newborn infant,' " but failed "to establish a triable issue of material fact as to the compliance with the standard of care by BEASLEY."  Beasley additionally pointed out that he had complied with the standard of care in ordering a cranial ultrasound and a CT scan.  Like Henry and Kolber, Beasley dismissed as "speculative and conjectural" the opinion of Aguilar's expert that earlier detection would have ameliorated his outcome, and added that the experts did not "render any opinion, based upon competent admissible evidence, that any act or failure to act on the part of BEASLEY resulted in the alleged skull fracture of the plaintiff nor that to a reasonable medical probability any act or failure to act on the part of BEASLEY alone resulted in any injury or damage to the plaintiff."  As to the fraud and willful misconduct causes of action, Beasley contended Aguilar had failed to submit any competent evidence to challenge his assertion that he did not cause and had no knowledge of any trauma to Aguilar's head.[8]

---

[8] As to Aguilar's assertion that on April 15, the admitting physician at CHLA noted a palpable fracture, Beasley contended that out of the 18,415 pages of CHLA records, only one page made reference to a " 'palpable' fracture."

### (c) Steinberg

Steinberg faulted Aguilar for not submitting a declaration from an obstetrician and gynecologist. Steinberg also argued that an expert opinion that Aguilar's injuries " 'occurred either at birth . . . or in the immediate post-delivery period' " was insufficient to create a triable issue of material fact as to whether Steinberg caused Aguilar's injury. He additionally contended he was entitled to summary adjudication on the fraud and willful misconduct causes of action because Aguilar submitted no evidence to contradict Steinberg's own declaration that he had made no representations to Aguilar's mother, that he had no knowledge about any peril to Aguilar, and that he had not consciously failed to act to avoid some peril.

## C. *The Court Grants Summary Judgment*

### 1. Oral Argument

The court heard the motions in April 2021. At oral argument, Aguilar contended Steinberg's motion should be denied because Aguilar's experts had opined the injury to his skull had occurred at delivery or shortly thereafter, that anyone involved in Aguilar's care would have known of the injury, and that Steinberg was present at the delivery.

Aguilar argued the motions of Henry and Kolber should be denied because a reasonable inference could be drawn that "Doctors Henry and/or Kolber caused or witnessed the incident." After Aguilar's counsel posited a hypothetical about a patient who awoke from surgery with a sponge in his abdomen but no idea which of his four surgeons left the sponge there, the court interrupted to ask, "You're not making a res ipsa argument, are you?" Aguilar's counsel responded, "Well, I could be, but I don't

17

know taking it a step further by having expert declaration and evidence in support of our claim. [*sic*] I know some attorney[]s who might try to make a case like this fly[,] your honor[,] without any experts and say[,] hey[,] I don't have to go through the trouble or the expense of proving my case. It's res ipsa, and maybe those attorneys would get by on summary judgment by doing so and maybe I should as well but beyond that we have evidence to support our claims in the form of competent expert testimony."

In response to a statement by Beasley's counsel that Aguilar was attempting to "convert the case into a res ipsa case," Aguilar's counsel countered that res ipsa loquitur was "not some separate cause of action," but "a theory of liability under a negligen[ce] claim," and "to the extent this is a res ipsa case, it is." Counsel asserted it was "beyond logical to say that a baby like Danny Ruiz Aguilar would not have a skull fracture causing significant hemorrhaging in or about the brain, absent the negligence of one or more of the medical providers involved in this case." He continued, "So I'm saying that. I think it's clear from the records that that's true. I think under a res ipsa theory -- and, again, res ipsa is meant for a purpose like this where there is no direct evidence, kind of like the sponge case I cited to earlier." Aguilar's counsel contended that while he could establish liability through "reasonable inference" and "a res ipsa theory," he had "not stopped there" and was not "resting on our laurels on a res ipsa claim." As to Beasley specifically, Aguilar argued his motion should be denied because Beasley had examined Aguilar multiple times and noted a "normal exam," which was untrue.

18

## 2. Written Ruling

Three weeks later, the court issued a detailed 28-page order granting respondents' motions for summary judgment.

### (a) Evidentiary Objections

Regarding respondents' evidentiary objections, the court sustained the objection to Sims's testimony that "time is of the essence in taking care of a brain injury caused by trauma and quite literally any type of earlier intervention in baby boy Aguilar's traumatic brain injury treatment would have resulted in a better outcome and reduction of neurological residuals. For example, had the providers involved in baby boy Aguilar's neonatal care recognized and acted upon his signs and symptoms of head trauma at any point in time before April 14, 2020, the following treatment would likely have been initiated sooner: evaluation for hypothermia, close vigilance to blood pressure values and supportive care for head trauma. To a reasonable degree of medical probability, this would have resulted in an improvement in baby boy Aguilar's condition." The court struck this testimony in its entirety, finding it to be speculative, lacking foundation, conclusory, and an improper expert opinion.

The court also struck the phrase "it would have been impossible" from Sims's testimony that "it would have been impossible for the medical providers involved in baby boy Aguilar's delivery (Dr. Cachur, Dr. Steinberg and CHMC labor/delivery nurses) and/or immediate post-delivery care (Scott A. Beasley, M.D., Michele Henry, M.D. and Keith Kolber, M.D.) to not have witnessed and/or known about the baby's skull injury," finding it speculative, lacking foundation, and conclusory.

19

## (b)    Medical Negligence

Addressing the cause of action for medical negligence first, the court found Steinberg had established a prima facie case that his conduct did not fall below the standard of care, and that nothing he did or did not do caused Aguilar's injury. The court further found that Aguilar failed to create a triable issue of fact as to both issues, faulting Aguilar's failure to submit a declaration from an obstetrician / gynecologist on the standard of care issue, and finding inadequate his experts' declarations because they "offer[ed] only a possibility" that the injury occurred during delivery and "conclusorily combines conduct of all moving Defendants to attempt to establish causation, with no effort to specifically explain how Steinberg's specific conduct contributed."

As to Henry and Kolber, the court found both had met their prima facie burden to demonstrate their conduct did not fall below the standard of care, and that nothing they did or did not do caused Aguilar's injuries. It further found that Aguilar had submitted sufficient evidence to create a triable issue of fact as to whether they had fallen below the standard of care by failing to notice or treat the skull fracture. However, the court nevertheless granted summary judgment because it held that Aguilar had failed to submit any evidence that Henry or Kolber caused the skull fracture, and had failed "to create a triable issue that there would have been a difference in outcome or how his condition would have improved" had Henry or Kolber done something differently.

As to Beasley, the court found that he had met his prima facie burden to demonstrate that his conduct did not fall below the standard of care and that nothing he did or did not do caused Aguilar's injuries. It further found that Aguilar had created

20

triable issues of fact as to whether Beasley's conduct had fallen below the standard of care because he failed to notice the skull fracture. However, the court granted Beasley's motion because Aguilar failed to establish a triable issue of fact as to causation. The court found the expert witness declarations "replete with 'and/or' opinions—i.e., multiple possibilities." For example, the court noted the expert opinions "cast blame on Dr. Henry, Dr. Kolber, Dr. Beasley *and/or* Dr. Steinberg" and noted "[t]here is no explanation as to what exact conduct by each defendant was the direct cause of Plaintiffs injuries and how." (Emphasis in original.) The court stated that while Aguilar faulted Beasley for failing to notice the injury sooner, the opinions of Aguilar's experts failed to explain "*how earlier intervention* would have resulted in a better outcome." (Emphasis in original.)

### (c)     Fraud and Willful Misconduct

The court then found that both Steinberg and Beasley had made a prima facie showing that they had neither concealed facts nor had knowledge of any injury to Aguilar's head. It further found that Aguilar "failed to meet [his] burden of offering sufficient evidence to create a triable issue of fact that each of the moving defendants act[ed] intentionally to actually injure Plaintiff or conceal Plaintiff's injury" when his experts' opinions were that the doctors "either *negligently missed the findings or intentionally failed* to document and treat the skull fracture." (Emphasis in original.)

In May 2021, the court entered judgment in respondents' favor. Aguilar timely appealed.

21

**D.** *A Different Judge Denies the Motion for Summary Judgment by Thomas Cachur*

In December 2022, Aguilar asked us to judicially notice the trial court's April 2022 ruling denying the motion for summary judgment brought by Thomas Cachur, the doctor who delivered Aguilar.[9]  In this ruling, the court granted Cachur's motion for summary adjudication as to fraud and willful misconduct, finding that Aguilar "failed to come forward with admissible evidence to create a triable issue of material fact that Cachur acted willfully." However, it denied Cachur's motion as to the medical negligence cause of action, finding that, while Cachur successfully established a prima facie case to negate an element of Aguilar's cause of action, Aguilar's "assertion of res ipsa loquitur is sufficient to carry his burden to create triable issues of material fact."  Judge Dillon's order also noted, without criticism or disagreement, that Judge Ongkeko had granted summary judgment to the respondents in this appeal.

We granted Aguilar's request for judicial notice.  However, the appellate record is still bereft of the pleadings associated with Cachur's motion for summary judgment—his initial motion and supporting evidence, Aguilar's opposition and any opposing evidence, and any reply.  Nor do we have a transcript of the hearing on Cachur's motion.

---

[9] This motion was decided by Judge Timothy Patrick Dillon.  The motions on appeal were decided by Judge Rafael Ongkeko.  Judge Dillon's order also mentions that the trial court had granted unopposed motions for summary judgment by "Grand Medical Associates and Roy Silver, M.D.," but had denied a motion brought by Dignity Health.

22

## DISCUSSION

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) "Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850.) Where summary judgment has been granted, "[w]e review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)

### A. *Aguilar Fails to Establish the Applicability of Res Ipsa Loquitur*

"Res ipsa loquitur is an evidentiary rule for 'determining whether circumstantial evidence of negligence is sufficient.' [Citation]. In California, it is 'a presumption affecting the burden of producing evidence.' " (*Howe v. Seven Forty Two Co., Inc.* (2010) 189 Cal.App.4th 1155, 1161.)

Aguilar contends the court erred in finding he had not met his burden to show a triable issue of fact because the evidence he submitted in opposition to the motions for summary judgment sufficiently established the doctrine of res ipsa loquitur. Respondents disagree, arguing that Aguilar forfeited the right to

23

argue res ipsa loquitur by failing to assert the doctrine below, that Aguilar failed to present evidence to establish the prerequisites for the doctrine, and that the presumption created by the doctrine disappeared once respondents presented evidence to demonstrate they were not negligent. Because we agree that Aguilar failed to present sufficient evidence to establish the doctrine, we do not consider respondents' other arguments.

It is well settled that a plaintiff must demonstrate three conditions for the doctrine of res ipsa loquitur to apply: " ' "(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." ' " (*Newing v. Cheatham* (1975) 15 Cal.3d 351, 359.)

Beasley and Steinberg argue that Aguilar failed to "proffer evidence that defendants had exclusive control of plaintiff during all relevant times." Henry and Kolber concur that Aguilar "did not establish that only the defendant health care providers had access to him during the time that the claimed head injury occurred, as opposed to the parents or visitors having had access to the infant." They add that Aguilar "did not provide any evidence whatsoever that his parents or a relative or family friend, any of whom could accidentally banged his head, did not hold him during the period of time that he claims that the injury could have occurred."

Aguilar counters that his expert witnesses reviewed his medical records and found "no indication that Danny was anywhere other than in the NICU on a ventilator (or with nasal breathing prongs) during the time in question" and that these

24

experts testified there were "only two possible causes for the fracture—either dropping or banging his head or crushing it during the delivery—while he was under the doctors' care in the NICU."  Aguilar further contends that "[c]ommon sense is also enough to determine that Danny was injured while in the exclusive control of Drs. Steinberg, Henry, Kolber, and Beasley," adding that "[t]here is nothing in the record to indicate that anyone other than the doctors had control over Danny's safety during his time in the NICU."

We agree with respondents.  Even were we to infer from the expert witness declarations that Aguilar spent his entire post-delivery stay in the NICU before being transferred to CHLA, that would not establish that Aguilar was not visited by a parent or relative during his time there.  "Common sense" tells us that a parent or relative may have visited Aguilar in the NICU, and that it is just as likely that a medically untrained relative negligently fractured Aguilar's skull.  Again, while Aguilar's expert witnesses presumably could have averred that the records disclosed no such visitors during his six-day stay at CHMC (assuming that were true), the experts did not do so.

Because Aguilar failed to present evidence at summary judgment that his injury was caused by an agency or instrumentality within the exclusive control of the respondents, he may not invoke the doctrine of res ipsa loquitur against these respondents to meet his burden to show the existence of a triable issue of material fact.[10]

_____

[10] We find distinguishable Aguilar's case citations to *Folk v. Kilk* (1975) 53 Cal.App.3d 176 and *Sanchez v. Bay General Hospital* (1981) 116 Cal.App.3d 776.  Neither case presented a
*(Fn. is continued on the next page.)*

25

### B. *The Court Did Not Err in Finding Aguilar Failed to Establish a Triable Issue of Material Fact*

#### 1. Medical Negligence

"The elements of a cause of action for medical malpractice are: (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305.)

The court found that each respondent had established a prima facie case that their conduct did not fall below the standard of care, and that nothing they did or did not do caused Aguilar's injuries. It further found that while Aguilar had demonstrated a triable issue of fact as to whether the conduct of Beasley, Henry, and Kolber fell below the standard of care, he had failed to do so regarding the issue of causation for each respondent, thereby entitling them to summary adjudication on medical negligence.

Aguilar contends the court erred because it used an incorrect evidentiary standard. Specifically, Aguilar claims that

---

situation in which someone other than the defendant (or its agent) could have caused the injury. (*Folk*, at p. 181 [plaintiff's claim against doctors "rests upon their failure to take a throat culture in time to have the results available before the surgery"]; *Sanchez*, at p. 788 ["[n]o doubt exists" that decedent "was under the exclusive control of the nursing staff of defendant" when injuries occurred].)

because he established the application of the doctrine of res ipsa loquitur, he was relieved from "his burden to proffer evidence to prove exactly what Drs. Steinberg, Henry, Kolber, and Beasley did to cause his injuries," and the court should have determined whether respondents had established that their negligence did not cause Aguilar's injuries. Aguilar also argues the court erred in striking a portion of his expert witness's testimony. Finally, Aguilar claims that " 'all favorable inferences that may reasonably be derived from' his experts' declarations" established that Aguilar "suffered a brain injury that affects his motor and cognitive skills, the brain injury is a result of the skull fracture, and Drs. Steinberg, Henry, Kolber, and Beasley's negligence caused the skull fracture."

We dispense with Aguilar's first argument—as discussed above, we find that Aguilar failed to establish the applicability of res ipsa loquitur. We address the remaining two arguments below.

### (a) The Court Did Not Err in Striking Testimony

Sims testified in her declaration that "time is of the essence in taking care of a brain injury caused by trauma and quite literally any type of earlier intervention in baby boy Aguilar's traumatic brain injury treatment would have resulted in a better outcome and reduction of neurological residuals. For example, had the providers involved in baby boy Aguilar's neonatal care recognized and acted upon his signs and symptoms of head trauma at any point in time before April 14, 2020, the following treatment would likely have been initiated sooner: evaluation for hypothermia, close vigilance to blood pressure values and supportive care for head trauma. To a reasonable degree of

27

medical probability, this would have resulted in an improvement in baby boy Aguilar's condition." The court struck this testimony in its entirety, finding it to be speculative, lacking foundation, conclusory, and an improper expert opinion.

Aguilar contends that "[t]he trial court's rulings on evidentiary objections in determining a motion for summary judgment are reviewed for abuse of discretion" and respondents agree. Aguilar argues the court abused its discretion by excluding this testimony because the testimony was based on Sims's "experience treating newborns and the evidence in the medical records that gives rise to the presumption that Drs. Steinberg, Henry, Kolber, and Beasley's negligence caused the skull fracture" and "based on her knowledge that Danny's injuries would have been less severe or non-existent had Drs. Steinberg, Henry, Kolber, and Beasley not been negligent and caused Danny to sustain a skull fracture." We discern no abuse of discretion.

"An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based." (*Wicks v. Antelope Valley Healthcare Dist.* (2020) 49 Cal.App.5th 866, 881.) While Sims opined that earlier intervention would have improved Aguilar's condition, she failed to provide any sort of reasoned explanation for how it would have done so. Specifically, she opined that, had Aguilar's fracture been discovered earlier, "the following treatment would likely have been initiated sooner: evaluation for hypothermia, close vigilance to blood pressure values and supportive care for head trauma." But she failed to explain why being evaluated for hypothermia,

having medical professionals paying closer attention to blood pressure values, or undergoing the vaguely described "supportive care for head trauma" would have improved Aguilar's outcome, particularly when Aguilar was born with a congenital myopathy. "An abuse of discretion occurs when the trial court exceeds the bounds of reason; even if we disagree with the trial court's determination, we uphold the determination so long as it is reasonable." (*Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1163.) On this record, we do not find the trial court exceeded the bounds of reason in excluding Sims's testimony as speculative and conclusory.

### (b) Aguilar's Evidence Fails to Raise a Triable Issue as to Causation

Aguilar argues that, while his expert witnesses' declarations may be " 'at times a bit obtuse,' " they still establish that "Drs. Steinberg, Henry, Kolber, and Beasley's negligence caused the skull fracture." We disagree.

Respondents were potentially responsible for two separate harms to Aguilar—the skull fracture itself and the delayed discovery of the fracture. As to the skull fracture itself, the court found Aguilar failed to rebut respondents' prima facie showing that they had not caused the fracture. The court pointed out that the declarations from Aguilar's expert witnesses were "replete with 'and/or' opinions—i.e., multiple possibilities." For example, they opined that the injury "was caused during the c-section ***and/or*** at some time after the c-section." Additionally, the declarations "cast blame on Dr. Henry, Dr. Kolber, Dr. Beasley ***and/or*** Dr. Steinberg," but lacked an "explanation as to what exact conduct by each defendant was the direct cause of Plaintiff's injuries and how."

29

As for the failure to discover the fracture, Aguilar does not dispute that Steinberg assisted only in the delivery, and never touched or examined Aguilar.  Nor does Aguilar provide any evidence showing that Steinberg witnessed or had any knowledge of his skull being fractured.  As for the three neonatologists, the court found that even if there were a triable issue as to whether they should have discovered the skull fracture, Aguilar failed to establish that earlier discovery would have changed his prognosis.  Acknowledging that one of Aguilar's experts had stated earlier detection would have permitted certain courses of treatment, the court found that the expert "never explains *how earlier intervention* would have resulted in a better outcome.  What improvement would have occurred?  How would each example of an earlier intervention have reduced injury or improved Plaintiff's condition?  Would earlier intervention have completely eliminated any risk of Plaintiff's injuries?  What effect do other factors have (complicated pregnancy history, mother's health, myotubular myopathy diagnosis) on Plaintiff's injuries?"

We agree with the trial court's analysis.  Aguilar can point to no direct evidence contradicting each respondent's testimony that they did not cause the skull fracture.  As to the discovery of the fracture, Aguilar's expert opined it had been palpable for "several days" before April 15, when it was noted by the admitting physician at CHLA.  In other words, it should have been detectable "several days" before April 15.  But Aguilar provided no competent evidence as to how the earlier discovery would have ameliorated his outcome.  We therefore hold that the trial court did not err in finding Aguilar failed to establish a triable issue of material fact as to whether respondents' actions caused his injuries.

## 2.     Fraud and Willful Misconduct

Sims testified that "it would have been impossible for the medical providers involved in baby boy Aguilar's delivery (Dr. Cachur, Dr. Steinberg and CHMC labor/delivery nurses) and/or immediate post-delivery care (Scott A. Beasley, M.D., Michele Henry, M.D. and Keith Kolber, M.D.) to not have witnessed and/or known about the baby's skull injury."[11]  The court struck the phrase "it would have been impossible" as speculative, lacking foundation, and conclusory.

Aguilar contends the court abused its discretion in doing so because the testimony was based on "evidence in the medical records" and Sims's "experience . . . working with newborns and their neurological issues."  We disagree.  Given that Sims could only speculate as to when the fracture occurred, it was within the bounds of reason for the trial court to find speculative the pronouncement that it would have been "impossible" for Cachur, Steinberg, Beasley, Henry, "and/or" Kolber to not have "witnessed and/or known" about the fracture.  This is especially true when Sims also testified that it was "more likely than not that these medical providers either negligently missed the

---

[11] Aguilar argues that both Sims and Weiss concluded "it is not possible that the doctors who delivered Danny or cared for him in the NICU did not witness a blunt force type trauma to Danny's head that caused the skull fracture and intracranial bleeding."  Weiss did not claim it was "not possible"; he testified "it is surprising that the medical providers involved in baby boy Aguilar's delivery (Dr. Cachur, Dr. Steinberg and CHMC labor/delivery nurses) and/or immediate post-delivery care (Scott A. Beasley, M.D., Michele Henry, M.D. and Keith Kolber, M.D.) did not suspect that baby boy Aguilar had a significant brain hemorrhage or injury."

31

findings or intentionally failed to document and treat the skull fracture." If the medical providers could have "negligently missed" the fracture, then it is self-evidently not "impossible" that they did not "witness[] and/or know[]" about the fracture. Thus, we agree with the trial court's finding that, because respondents' alleged failure to discover Aguilar's injury "could have been negligent" and Aguilar's expert was "speculative as to who kn[e]w what at what time and the extent of that knowledge," Aguilar failed to overcome respondents' showing that they had no knowledge of Aguilar's injury and did not intentionally conceal any facts. Because fraud and willful misconduct both require an intentional act, we hold the court did not err in finding Steinberg and Beasley were entitled to summary adjudication as to those causes of action.

### C. *Aguilar Has Forfeited Any Argument Regarding the Denial of Cachur's Motion*

Aguilar's final argument is that, because Judge Dillon denied Cachur's motion for summary judgment, we are required to reverse the grant of the summary judgment motions on appeal, lest this case be plagued with "inconsistent rulings." Respondents counter—and Aguilar admits—that Aguilar presents no direct authority to support this argument. Nor does Aguilar explain why, if the rulings truly were inconsistent, we could not determine that it was Judge Dillon's ruling that was incorrect as opposed to Judge Ongkeko's. But we need not decide these issues because we lack a sufficient record to determine whether the denial of Cachur's motion was inconsistent with the granting of respondents' motions. While Aguilar asked us to judicially notice Judge Dillon's ruling, he failed to provide

32

Cachur's moving papers, any opposition or reply, and any reporter's transcript from the hearing.

Aguilar argues that the record before us is sufficient "because the trial court's ruling on Dr. Cachur's motion contains a detailed recitation of the parties' arguments and evidence." But Judge Dillon also noted Judge Ongkeko's granting of the summary judgment motions at issue here, without criticism, implying Judge Dillon did not find those rulings inconsistent with his own.

" 'It is the duty of an appellant to provide an adequate record to the court establishing error. Failure to provide an adequate record on an issue requires that the issue be resolved against appellant.' " (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 348.) Because Aguilar failed to provide an adequate record regarding the denial of Cachur's motion, he has forfeited this argument.

## DISPOSITION

The judgments are affirmed. Respondents are awarded their costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.                    WEINGART, J.

33